## **Table of Exhibits**

Exhibit A                    Employment Agreement dated April 30, 2004

Exhibit B                    Consulting Agreement dated October 1, 2004

Exhibit C                    Consulting Agreement dated October 1, 2005

Exhibit D                    Convertible Loan Agreement dated November 9, 2004

Exhibit E                    Convertible Loan Agreement dated November 25, 2004

Exhibit F                    Convertible Loan Agreement dated December 16, 2004

Exhibit G                    Convertible Loan Agreement dated March 4, 2005

Exhibit H                    Debt Settlement Agreement dated September 30, 2005

Exhibit I                    Advertising Agreement dated September 30, 2005

Exhibit "A"

# EMPLOYMENT AGREEMENT

THIS AGREEMENT dated for reference the April 30, 2004.

BETWEEN:

> **KENT CARASQUERO** businessman of 1057 East 21st Avenue, Vancouver, British Columbia V5V 1S6
>
> (herein called "Employee")

AND:

> **NEWMARK VENTURES, INC.**, a company duly incorporated under the laws of Delaware and having an office located at Suite 440 – 375 Water Street, Vancouver, B.C., Canada, V6B 5C6
>
> (hereinafter called the "Corporation" or "Newmark")

**WHEREAS:**

A.   The Company is currently a holding company with a minority interest in Riverside Inc.. The Company's intention is to act as a diversified holding company that will own both majority and minority interests in various business operations that will be acquired primarily with the Company's common stock. (the **"Business"**).

B.   The Employee will be employed by the Corporation as President and Chief Executive Officer.

C.   The Corporation expends significant time, energy and funds to maintain its relationships with its clients and customers, and information relating to its clients and customers and its method of conducting business is highly confidential. Therefore, it is important that the Employee agrees to certain restrictive covenants with respect to confidential information and clientele or shareholders of the Corporation.

D.
**NOW THEREFORE THIS AGREEMENT WITNESSES** that, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings set forth below:

a)  **"Board"** means the Board of Directors of the Corporation.

b)  **"Cause"** means:

    i.    any material dishonesty by the Employee in connection with his dealings with the Corporation or any Client, Customer or Shareholder;

    ii.    any willful violation of a material provision of this Agreement;

    iii.    the material failure of the Employee to perform his duties hereunder, resulting in damage to the Corporation;

    iv.    a violation of any of the covenants contained in Article 8 hereof;

    v.    conviction or admission of a crime which is regarded at law as a felony;

    vi.    the habitual consumption of and being under the influence of illegal drugs or alcoholic beverages while on working time which affects the performance by the Employee of his duties and responsibilities.

c)  **"Customer"** means any person, trust, partnership, corporation or other entity for which the Corporation (i) rendered services during the twenty-four (24) months preceding the termination of employment of the Employee; (ii) made a written proposal for services during the twenty-four (24) months preceding the termination of employment of the Employee; or (iii) anticipates that a written proposal will be made based upon contacts or solicitation during the twenty-four (24) months preceding the termination of employment of the Employee; and (iv) all persons, trusts, partnerships, corporations or other entities affiliated with, controlling, controlled by or under common control with any of the foregoing.

d)  **"Fiscal Year"** means the taxable year of the Corporation for Federal income tax purposes.

e)  **"Party"** means and includes, whenever the context permits, all of the signatories of this Agreement and their respective successors and Legal Representatives.

f)  **"Person"** means a natural person, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

g)  **"Wholly Disabled"** means physical or mental impairment which entitles the Employee to receive benefits for total disability pursuant to the Social Security Act, or when, as a result of personal injury or sickness, he is so disabled that he is prevented from performing the principal duties of his employment and is under the regular care and attendance of a currently licensed physician or surgeon.

## ARTICLE 2

## EMPLOYMENT AND DUTIES

The Employee will be employed as the President and Chief Financial Officer of Newmark. The Employee shall devote his professional time and attention to the Corporations business. The Employee's duties with respect to the Corporation shall include: managing the day to day operational affairs of the Company:

a) overseeing all routine banking and financial matters, and assisting the Board as a planner and advisor in all non-routine banking affairs and relations (non-routine to include any loans or the re-financing of any current or future loans held by the Company);

b) assisting the Board in the selection of any sites for expansion of the Business;

c) maintaining favorable relationships with existing Customers and Shareholders; and

d) Preparing, reviewing, editing, management and coordination of contractual and regulatory filing documents

## ARTICLE 3

## TERM

Except as may be otherwise provided herein, the term of the Employee's employment with the Corporation shall continue from the date of this Agreement.

3.1 Termination by Corporation Without Cause. The term of employment shall terminate, at any time, if the Corporation gives the Employee written notice, and the effective date shall be the date of such notice unless otherwise stipulated by Corporation, provided that: in the event of termination without Cause during the first year of the Agreement, Corporation shall pay the mployee that amount equal to the prorated amount of his then-current Base Salary representing a six week period.

a) In the event of termination without Cause during the second year of the Agreement, Corporation shall pay the Employee an amount equal to the prorated amount of his then-current Base Salary representing an eight week period.

3.2 Termination for Cause. The term of employment shall terminate, at any time, if the Corporation gives to the Employee notice of immediate termination for Cause, in which case the effective date of termination shall be the date on which such notice is given.

3.3 Disability. The term of employment shall terminate if the Employee becomes Wholly Disabled and the Corporation gives written notice of termination to Employee and such termination shall be considered without Cause for purposes of this Article 3.

3.4 Death. The term of employment shall terminate upon the death of the Employee and such termination shall be considered without Cause for purposes of this Article 3.

3.5 Voluntary Withdrawal By Employee. The term of employment shall terminate if the Employee gives to the Corporation prior written notice of voluntary termination and the effective date of the termination. At the sole option of the Corporation, such termination may be considered termination with Cause for purposes of this Article 3. The effective date of any voluntary withdrawal shall be not less than ninety (90) nor more than one hundred & eighty (180) days after the date of the notice of voluntary termination. At any time prior to the effective date of such termination as designated in such notice of voluntary termination, the Corporation may accelerate the effective date of termination by giving notice thereof to the Employee. Such accelerated effective date of termination shall be designated in the Corporation's notice of acceleration and may be the date of the giving of notice of acceleration by the Corporation or any date thereafter which is prior to the effective date designated in the Employee's original notice.

## ARTICLE 4
## COMPENSATION

**4.1**   **Base Salary.**

   a)   **Amount of Salary.**  The Employee shall receive a Base Salary of USD $2500 per month subject to such increases, if any, deemed appropriate by the

   b)   **Payment of Base Salary.**  The Base Salary shall be paid in equal installments in accordance with the normal payroll policies of the Corporation which shall not be less frequently than monthly.

   c)   **Payment of Shares.**  In order to induce the Employee to enter into his employment with Corporation, Corporation will issue 1,000,000 common shares of Newmark from the corporations treasury.

## ARTICLE 5

## FRINGE BENEFITS

   a)   **Insurance.**  In the event that and so long as the Corporation maintains the following plans, the Corporation will provide the Employee with Directors Liability Insurance.

## ARTICLE 6

## Representations, Warranties and Covenants

   a)   **Representations, Warranties and Covenants of Corporation**. Corporation as of the date hereof represents, warrants and covenants to Employee as follows:

   The Corporation is a corporation duly organized, legally existing and in good standing under the laws of the State of Delaware and has the corporate power and authority to own its properties and to carry on its business as now being conducted.

The Corporation (i) has the requisite corporate power and authority to enter into and perform this Agreement; (ii) the execution and delivery of this Agreement by the Corporation and the consummation of the transactions contemplated hereby have been duly authorized by the Board and no further consent or authorization of the Corporation or its Board or shareholders is required; (iii) this Agreement has been duly executed and delivered by the Corporation; and (iv) this Agreement constitutes a valid and binding obligation of the Corporation enforceable against the Corporation in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally the enforcement of, creditors' rights and remedies or by other equitable principles of general application.

b) **Representations, Warranties and Covenants of Employee.**  Employee hereby as of the date hereof represents, warrants and covenants to Corporation that the Employee has the ability to enter into this Agreement without breaching any other contract, including, but not limited to, any employment agreement, non-competition agreement or covenant not to compete violating any law or administrative regulation and this Agreement constitutes a valid and binding obligation of Employee, enforceable against Employee in accordance with its terms.

## ARTICLE 7

## RESTRICTIVE COVENANTS

a) **Acknowledgments as to Customers and Trade Secrets.**  The Employee acknowledges (i) that he shall have access to the internal business organization, and other highly confidential information and matters of the Corporation ; (ii) that the Corporation has a proprietary interest in their customers and internal business records and procedures; (iii) that all documents and information concerning the  method of conducting business, sales, prices and costs of the Corporation  and specialized requirements of the  Corporation are highly confidential and constitute trade secrets of the Corporation; (iv) that the Corporation have expended considerable funds to maintain their business relationships, and (v) that the Corporation has a proprietary interest in and to their trade secrets. All of the foregoing trade secrets of the Corporation and the Subsidiary shall be referred to in this Agreement individually as a **"Trade Secret"** or collectively as the **"Trade Secrets"**.

b) **Confidentiality and Use.**  In recognition of the acknowledged importance and sensitivity of the Trade Secrets to which the Employee has access, the Employee agrees that during the Employee's term of employment with the Corporation and forever following the termination of his employment with the Corporation for any reason, with or without cause or voluntarily, the Employee shall not, directly or indirectly, sell, alienate, transfer, assign or divulge any of the Trade Secrets of the Corporation or the Subsidiary to any past, present or potential customer or competitor of the Corporation, nor shall the Employee use the Trade Secrets of the Corporation or the Subsidiary for his own benefit or for the benefit of any person or entity with whom he is employed or has an economic interest.

c) **Solicitation of Customers.**  The Employee agrees that, for the term of the Employee's employment with the Corporation and for a period of twenty-four months (24) following the termination of his employment with the Corporation for any reason, with or without cause or voluntarily, the Employee shall not solicit, directly or indirectly, on his own behalf, nor on behalf

of any corporation, partnership, joint venture, individual or other Person other than the Corporation, the business of any Customer.

d) **Solicitation of Employees**.   The Employee agrees that, for the term of the Employee's employment with the Corporation and for a period of twelve months (12) following the termination of his employment with the Corporation for any reason, with or without cause or voluntarily, the Employee shall not offer, directly or indirectly, employment to any employee of the Corporation employed during the Employee's employment or employed by the Corporation in the twelve (12) months following Employee's termination, regardless of whether such offer be on Employee's own behalf or on behalf of any corporation, partnership, joint venture, individual or other Person other than the Corporation, nor will Employee, directly or indirectly, cause any corporation, partnership, joint venture, individual or other Person other than the Corporation to hire any such employee of the corporation.

e) **Restriction on Competition**.  In recognition of the acknowledged importance and sensitivity of the Trade Secrets to which the Employee has access and the legitimate needs of Corporation to protect and enjoy its goodwill and customer relationships, the Employee agrees that for a period of two (2) years following the termination of his employment with the Corporation for any reason, with or without cause or voluntarily, Employee shall not, within a radius of twenty (20) miles of the Corporation, directly or indirectly, own, operate, manage, control, consult with, be a joint venture with, advise, or be engaged as an employee or otherwise by any Person, or own any securities of any Person, which sells products or services similar to those sold or offered by the Corporation.

f) **Reasonable Limit**.   The parties have attempted to limit the Employee's ability and right to compete only to the extent necessary to protect the Corporation from unfair competition.  If, however, the scope or enforceability of the restrictive covenants contained in this Agreement are in any way disputed at any time, a court or other trier of fact may modify and enforce the covenants to the extent that it believes is reasonable under the circumstances existing at that time.

g) **Computation of Damages**.  The Employee agrees that if he breaches the restrictive covenants set forth in this Agreement, he shall pay the actual damages which the Corporation sustains following such breach.  In addition to the actual damage amount, the Employee shall pay the reasonable attorneys' fees, costs and professionals' fees of the Corporation that arise from or are associated with the Employee's breach of any such restrictive covenant.

h) **Continuing Nature of Damages**.   The Employee acknowledges that upon breaching the restrictive covenants contained in this Agreement, he will cause damage of an irreparable and continuing nature to the Corporation for which money damages may not provide adequate relief. Therefore, the Employee agrees that in addition to any money damages, which only compensate the Corporation for damages they have already suffered, the Corporation is also entitled to obtain an injunction for the remainder of the period specified in the restrictive covenant which the Employee breached. Employee acknowledges that he will be able to earn a living without violating the restrictive covenants contained in this Agreement.

i) **Cumulative Remedies**.  The remedies contained in this Article are in addition to any other remedies either specified in this Agreement or otherwise available.

j) **Survival of Covenants**.  The Employee's duties and obligations under this Article shall survive the termination of this Agreement or any of the provisions of this Agreement. If the Corporation resorts to the courts for enforcement of these restrictive covenants, then the duration of the restrictive covenants shall be extended for a period of time equal to the period of such breach,

commencing on the date of a final court order, settlement agreement or the award of any mediator or arbitrator.

## ARTICLE 8

## RETURN OF DATA

Upon the termination of the Employee's employment with the Corporation for any reason, the Employee shall promptly return to the Corporation all notes, data, reference materials, logos, estimates, proposals, artwork, memoranda, documents, instruments, records and all other information which in any way incorporates or reflects the Corporation's Customer names, customer lists, or other Trade Secrets or any information related to Trade Secrets.

## ARTICLE 9

## GENERAL

a) **Termination of Agreement**.  In addition to any other provisions of this Agreement, this Agreement shall terminate upon the happening of any one of the following events:

b) **Agreement**.  The parties execution of an instrument that specifically terminates this Agreement;

c) **Bankruptcy**.  The expiration of thirty (30) days following the filing of a petition in bankruptcy by or against the Corporation, if such petition is not dismissed during such thirty (30) day period; or

d) **Dissolution**.  The voluntary or involuntary dissolution of the Corporation.

e) **Prior Rights Preserved**.  Nothing contained in this Section shall affect or impair any of the rights or obligations arising prior to or at the time of the termination of this Agreement, or which may arise by any event causing the termination of this Agreement. Articles 7 and 8 of this Agreement shall survive the termination of this Agreement for any reason.

f) **Cessation of Payments**.  In the event of termination pursuant to this Article, then Employee's right to termination pay and COBRA payments in accordance with Section 3.1 shall immediately cease.  Additionally, all benefits to the Employee shall cease immediately upon termination under this Article.

g) **Notices**.  All notices, requests, consents, approvals or agreements concerning this Agreement shall be given in writing either by actual delivery of the notice into the hands of the Party entitled to receive it, or by mailing such notice by registered or certified mail, return receipt requested, in which case the notice shall be deemed to be given on the date of its mailing.  All such notices shall be addressed as follows:

   i. **If to the Corporation:**

   ii. **If to the Employee:**

h) **Personal Services**. This is an agreement for personal services and as such the Employee may not assign any of his rights, duties and obligations under this Agreement.

i) **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the Employee and the Corporation, as well as their respective heirs, personal representatives and assigns.

j) **Complete Understanding**. This Agreement constitutes the complete understanding between the parties and supersedes any prior understanding between the parties whether written or oral. No alteration or modification of any of this Agreement's provisions shall be valid unless made in writing and signed by all parties.

k) **Applicable Law**. The laws of the Province of British Columbia shall govern this Agreement, irrespective of the fact that one or more of the parties now is or may become a resident of a different province, jurisdiction or state.

l) **Severability**. In the event a court of competent jurisdiction adjudicates any one or more of this Agreement's provisions as invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any of this Agreement's other provisions, and this Agreement shall be construed as if it had never contained such invalid, illegal or unenforceable provision.

m) **Execution**. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and such counterparts together will constitute one instrument.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement as of the day and year first above written.

Signed, Sealed and Delivered by           )
**KENT CARASQUERO**                        )
in the presence of:                        )
                                           )
_____           )
                                              KENT CARASQUERO
                                              President, CFO

Signed, Sealed and Delivered by           )
**NEWMARK VENTURES, INC.**                 )
was hereunto affixed in the presence of:   )
                                           )
_____           )
                                              MARTIN TUTSCHEK
                                              Secretary, Director

Exhibit "B"

# CONSULTING AGREEMENT

This FEE AGREEMENT (the "Agreement") is between NEWMARK VENTURES, INC. (herein after the "Client" or the "Company") and Kent Carasquero (herein after the "Consultant").

Consultant has agreed to provide necessary, non-promotional, services to Client with respect to the development of the Company's business. To protect both of the parties and to comply with professional obligations, we have already discussed with each other and resolved any potential conflicts of interest with present or former clients. The services which Consultant provides are in accordance with the following terms and conditions:

1.   Services to be Rendered

Client has retained Consultant for the purpose of assisting the Company in the conduct of its business, including its day to day operations.   It is contemplated that the services to be rendered by Consultant will include, but not necessarily be limited to the introduction of business associations and potential strategic business partners; engineering financial structures relating to the acquisition of business operations, strategic business alliances; business combinations; mergers and acquisitions; and joint venture opportunities

It is contemplated that the services to be rendered by Consultant will also include, but not necessarily be limited to:

- Management of Accounts Receivable
- Management of Accounts Payable
- Liaison with Company Accountants
- Liaison with Company Lawyers
- Interfacing with Company directors and officers

It is understood that the services to be provided by Consultant, as agreed to by the parties pursuant to this agreement, shall include, but not be limited to, non-promotional services necessary to assure compliance by the Company with the provisions of the 1933 and 1934 Act, and regulations adopted pursuant thereto.   Consultant shall have no responsibility for the accuracy of the substantive representations or representations of fact which are or may be included in documents filed with the Securities and Exchange Commission.

The Company shall be solely responsible for the substantive content of any SEC filings and the truthfulness of all statements made therein.   Consultant's services shall be to assist the Company in gathering, editing and formatting the information which may be necessary to complete the filing and formatting the information provided by the Client so that it is presented in compliance with the rules and regulations adopted by the SEC.

2.   Fees

Fees charged herein are based upon the reasonable value of Consultants services as heretofore agreed to by the parties.   Fees are based on the rates normally charged by Consultant.

Consultants normal fee is Five Thousand Dollars (CDN $5,000) per month. It is anticipated that Client and Consultant may agree on fixed fees for special projects from time to time.   The fee

arrangements for special projects will be agreed to in writing from time to time. The duration of this contract shall be for twelve months and the company must pay the consultant for services for the first three months in advance with no ability to rescind the contract for duration of the contract (12 months). After the first three months has ended the Consultant shall be on a month-to-month payment schedule. The dollar amount of this contract shall be a total of sixty thousand (CDN $60,000).

Consultant has not been engaged to perform, nor will Consultant agree to perform any Investor Relations or Promotional services in connection with the services to be provided to the Company. It is mutually understood and agreed that any fees for services that are in connection with a capital raising transaction shall be paid in cash.

3.     Costs and Expenses

Client understands that in the course of any subsequent representation, it may be necessary for Consultant to incur certain costs or expenses. Client will reimburse Consultant for certain costs or expenses actually incurred and reasonably necessary for completing the assigned matter, as long as the charges for costs and expenses are competitive with other sources of the same products or services. More particularly, Client will reimburse Consultant in accordance with the following guidelines:

> A.     Travel.    Client will reimburse Consultant for expenses in connection with out of town travel. However, Client will only reimburse for economy class travel and, where necessary, for the reasonable cost of a rental car. All related travel expenses, i.e., lodging and meals, must be reasonable under the circumstances.

> B.     Filing Fees & Court Costs.  Client will reimburse Consultant for expenses incurred in connection with filing fees and court costs, if any, but will not be responsible for sanctions or penalties imposed due to the conduct of Consultant.

4.     Billing

Client shall have the option of paying subsequent billing by issuing sufficient common shares (the "Fee Shares") of the Company to the Consultant which when sold will satisfy the amount owed. The Consultant, has not been engaged to perform, nor will the Consultant agree to perform any services in connection with a capital raising transaction in exchange for shares.  It is mutually understood and agreed that any fees for services that are in connection with a capital raising transaction shall be paid in cash.

Registration of Client Shares

No later than ten (10) days following the date hereof as to the issuance of the Fee Shares, Client will cause such shares to be registered with the Securities and Exchange Commission under a Form S-8 or other applicable registration statement, and it shall cause such registration statement to remain effective at all time while the Consultant holds such shares. At the Consultants election, such shares may be issued prior to registration in reliance on exemptions from registration provided by Section 4(2) of the Securities Act of 1933 (the "33 Act"), Regulation D of the '33 Act, and applicable state securities laws.

5.     Involvement of Client

Client expects to be kept closely involved with the progress of Consultant's services in this matter. Consultant will keep Client informed of all material developments in this matter, and, in the case of litigation or administrative proceedings, will provide sufficient notice to enable a representative to attend meetings, conferences, hearings and other proceedings. A copy of all correspondence in the course of Consultant's services will be forwarded to Client.

There may be times when Consultant will need to obtain information from Client. All requests for access to documents, employees, or other information shall be granted without unreasonable delay. At the conclusion of this matter, all documents obtained shall be returned upon request.

6.     Waiver of Certain Conflicts.

Because Consultant's representation is limited in scope, Client has agreed that, subject to conditions described below, Consultant may represent, now and in the future, other persons and entities.  In particular, Client has agreed that while Consultant is representing Client in active pending matters, he may represent other clients in any matter adverse to Client (or Client's affiliates), provided that the matters (a) are not substantially related to active matters Consultant is working on for Client, (b) do not involve situations where Consultant has obtained confidential information from Client that is material to the new matter(s), and (c) do not involve litigation against Client.  In addition, if Consultant's representation of Client is terminated, he may thereafter represent others with interests adverse to Client's interests (even in litigation), provided that the representation does not involve confidential information Consultant has obtained from Client that is material to those matters.  By executing this Agreement Client is confirming the above and agreeing to waive any conflict of interest that arises in such situations.

7.     Termination

Client shall have the right to terminate Consultant's engagement by written notice at any time subject to the payout of any fees outstanding. Consultant has the same right to terminate this engagement, subject to an obligation to give Client reasonable notice to permit it to obtain alternative representation or services and subject to applicable ethical provisions. Consultant will be expected to provide reasonable assistance in effecting a transfer of responsibilities to the new firm.

8.     Records and Files Retention.

All records and files will be retained and disposed of in compliance with Consultant's policy in effect from time-to-time.  Subject to future changes, it is Consultant's current policy not to retain records relating to a matter for more than three (3) years from the date the matter is opened. Upon your prior written request, I will return records to you prior to their destruction.  It is not administratively feasible to advise you of the closing of a matter or the disposal of records.  It is recommended, therefore, that you maintain your own files for reference at the conclusion of this matter.  If you have any questions concerning records retention policies, please contact Consultant.

9.     No Guarantee of Success.

It is impossible to provide any promise or guarantee about the outcome of Client's matter. Nothing in this Agreement or any statements by Consultant or his assistants in dealing with the Client's matters constitute a promise or guarantee. Any comments about the outcome of the Client's matters are expressions of opinion only.

10.    Consultant's Fees.

This Agreement is governed by the laws of British Columbia and sets forth the entire agreement between the parties for rendering of the services, including professional services, which may occur pursuant to the terms of this agreement. All prior agreements or understandings of the parties have been and are merged herein. This agreement can be amended or modified only in writing. Each party signing below is jointly and severally responsible for all obligations due to Consultant and represents that each has full authority to execute this Agreement so that it is binding. This Agreement my be signed in one or more counterparts and binds each party signing it whether or not any other proposed signatory ever executes it. If any provision of this Agreement or the application thereof is held invalid or unenforceable, the invalidity or unenforceability shall not affect other provisions or applications, and to this end the provisions of this Agreement are declared to be severable.

Dated October 1, 2004

Newmark Ventures, Inc.

Authorized Signatory

Name: Roderick Shand

Title: President

Dated: October 1, 2004

Kent Carasquero

Exhibit "C"

# CONSULTING AGREEMENT

This FEE AGREEMENT (the "Agreement") is between MANGAPETS, INC. (herein after the "Client" or the "Company") and Kent Carasquero (herein after the "Consultant").

Consultant has agreed to provide necessary, non-promotional, services to Client with respect to the development of the Company's business. To protect both of the parties and to comply with professional obligations, we have already discussed with each other and resolved any potential conflicts of interest with present or former clients. The services which Consultant provides are in accordance with the following terms and conditions:

1.    Services to be Rendered

Client has retained Consultant for the purpose of assisting the Company in the conduct of its business, including its day to day operations. It is contemplated that the services to be rendered by Consultant will include, but not necessarily be limited to the introduction of business associations and potential strategic business partners; engineering financial structures relating to the acquisition of business operations, strategic business alliances; business combinations; mergers and acquisitions; and joint venture opportunities

It is contemplated that the services to be rendered by Consultant will also include, but not necessarily be limited to:

- Management of Accounts Receivable
- Management of Accounts Payable
- Liaison with Company Accountants
- Liaison with Company Lawyers
- Interfacing with Company directors and officers

It is understood that the services to be provided by Consultant, as agreed to by the parties pursuant to this agreement, shall include, but not be limited to, non-promotional services necessary to assure compliance by the Company with the provisions of the 1933 and 1934 Act, and regulations adopted pursuant thereto. Consultant shall have no responsibility for the accuracy of the substantive representations or representations of fact which are or may be included in documents filed with the Securities and Exchange Commission.

The Company shall be solely responsible for the substantive content of any SEC filings and the truthfulness of all statements made therein. Consultant's services shall be to assist the Company in gathering, editing and formatting the information which may be necessary to complete the filing and formatting the information provided by the Client so that it is presented in compliance with the rules and regulations adopted by the SEC.

2.    Fees

Fees charged herein are based upon the reasonable value of Consultants services as heretofore agreed to by the parties. Fees are based on the rates normally charged by Consultant.

Consultants normal fee is Five Thousand Dollars (CDN $5,000) per month. It is anticipated that Client and Consultant may agree on fixed fees for special projects from time to time. The fee

arrangements for special projects will be agreed to in writing from time to time. The duration of this contract shall be for twelve months and the company must pay the consultant for services for the first three months in advance with no ability to rescind the contract for duration of the contract (12 months). After the first three months has ended the Consultant shall be on a month-to-month payment schedule. The dollar amount of this contract shall be a total of sixty thousand (CDN $60,000).

Consultant has not been engaged to perform, nor will Consultant agree to perform any Investor Relations or Promotional services in connection with the services to be provided to the Company. It is mutually understood and agreed that any fees for services that are in connection with a capital raising transaction shall be paid in cash.

3.      Costs and Expenses

Client understands that in the course of any subsequent representation, it may be necessary for Consultant to incur certain costs or expenses. Client will reimburse Consultant for certain costs or expenses actually incurred and reasonably necessary for completing the assigned matter, as long as the charges for costs and expenses are competitive with other sources of the same products or services. More particularly, Client will reimburse Consultant in accordance with the following guidelines:

> A.      Travel.    Client will reimburse Consultant for expenses in connection with out of town travel. However, Client will only reimburse for economy class travel and, where necessary, for the reasonable cost of a rental car. All related travel expenses, i.e., lodging and meals, must be reasonable under the circumstances.

> B.      Filing Fees & Court Costs.    Client will reimburse Consultant for expenses incurred in connection with filing fees and court costs, if any, but will not be responsible for sanctions or penalties imposed due to the conduct of Consultant.

4.      Billing

Client shall have the option of paying subsequent billing by issuing sufficient common shares (the "Fee Shares") of the Company to the Consultant which when sold will satisfy the amount owed. The Consultant, has not been engaged to perform, nor will the Consultant agree to perform any services in connection with a capital raising transaction in exchange for shares. It is mutually understood and agreed that any fees for services that are in connection with a capital raising transaction shall be paid in cash.

Registration of Client Shares

No later than ten (10) days following the date hereof as to the issuance of the Fee Shares, Client will cause such shares to be registered with the Securities and Exchange Commission under a Form S-8 or other applicable registration statement, and it shall cause such registration statement to remain effective at all time while the Consultant holds such shares. At the Consultants election, such shares may be issued prior to registration in reliance on exemptions from registration provided by Section 4(2) of the Securities Act of 1933 (the "33 Act"), Regulation D of the '33 Act, and applicable state securities laws.

5.      Involvement of Client

Client expects to be kept closely involved with the progress of Consultant's services in this matter. Consultant will keep Client informed of all material developments in this matter, and, in the case of litigation or administrative proceedings, will provide sufficient notice to enable a representative to attend meetings, conferences, hearings and other proceedings. A copy of all correspondence in the course of Consultant's services will be forwarded to Client.

There may be times when Consultant will need to obtain information from Client. All requests for access to documents, employees, or other information shall be granted without unreasonable delay. At the conclusion of this matter, all documents obtained shall be returned upon request.

6.      Waiver of Certain Conflicts.

Because Consultant's representation is limited in scope, Client has agreed that, subject to conditions described below, Consultant may represent, now and in the future, other persons and entities.  In particular, Client has agreed that while Consultant is representing Client in active pending matters, he may represent other clients in any matter adverse to Client (or Client's affiliates), provided that the matters (a) are not substantially related to active matters Consultant is working on for Client, (b) do not involve situations where Consultant has obtained confidential information from Client that is material to the new matter(s), and (c) do not involve litigation against Client.  In addition, if Consultant's representation of Client is terminated, he may thereafter represent others with interests adverse to Client's interests (even in litigation), provided that the representation does not involve confidential information Consultant has obtained from Client that is material to those matters.  By executing this Agreement Client is confirming the above and agreeing to waive any conflict of interest that arises in such situations.

7.      Termination

Client shall have the right to terminate Consultant's engagement by written notice at any time subject to the payout of any fees outstanding. Consultant has the same right to terminate this engagement, subject to an obligation to give Client reasonable notice to permit it to obtain alternative representation or services and subject to applicable ethical provisions. Consultant will be expected to provide reasonable assistance in effecting a transfer of responsibilities to the new firm.

8.      Records and Files Retention.

All records and files will be retained and disposed of in compliance with Consultant's policy in effect from time-to-time.  Subject to future changes, it is Consultant's current policy not to retain records relating to a matter for more than three (3) years from the date the matter is opened. Upon your prior written request, I will return records to you prior to their destruction.  It is not administratively feasible to advise you of the closing of a matter or the disposal of records.  It is recommended, therefore, that you maintain your own files for reference at the conclusion of this matter.  If you have any questions concerning records retention policies, please contact Consultant.

9.      No Guarantee of Success.

It is impossible to provide any promise or guarantee about the outcome of Client's matter. Nothing in this Agreement or any statements by Consultant or his assistants in dealing with the Client's matters constitute a promise or guarantee.  Any comments about the outcome of the Client's matters are expressions of opinion only.

10.     Consultant's Fees.

This Agreement is governed by the laws of British Columbia and sets forth the entire agreement between the parties for rendering of the services, including professional services, which may occur pursuant to the terms of this agreement.  All prior agreements or understandings of the parties have been and are merged herein. This agreement can be amended or modified only in writing.  Each party signing below is jointly and severally responsible for all obligations due to Consultant and represents that each has full authority to execute this Agreement so that it is binding.   This Agreement my be signed in one or more counterparts and binds each party signing it whether or not any other proposed signatory ever executes it.  If any provision of this Agreement or the application thereof is held invalid or unenforceable, the invalidity or unenforceability shall not affect other provisions or applications, and to this end the provisions of this Agreement are declared to be severable.

Dated October 1, 2005

MangaPets, Inc.

_____
Authorized Signatory

Name: Roderick Shand

Title: President


Dated: October 1, 2005


_____
Kent Carasquero

**Exhibit "D"**

CONVERTIBLE LOAN AGREEMENT

THIS AGREEMENT dated the 9TH Day of November 2004.

BETWEEN:

> NEWMARK VENTURES, INC., having offices located at 440-375 Water Street, Vancouver, British Columbia, V6E 2P4
>
> (herein referred to as "The Borrower or The Company")

AND:

> LESLIE LOUNSBURY
>
> (herein referred to as "The Lender")

WHEREAS:

A.      The Borrower has requested that The Lender provide the borrower with a loan in the amount of Ten Thousand Dollars (10,000) USD for working capital and,

B.      The Lender has agreed to loan to The Borrower the sum of Ten Thousand Dollars (10,000) USD and The Borrower has agreed to accept that sum as a loan from The Lender; and,

C.      The parties hereto are desirous of clarifying the nature of the loan transaction and have therefore agreed to the terms herein.

NOW THEREFORE THIS AGREEMENT WITNESSES that in consideration of the premises and mutual covenants and agreements hereinafter set forth, The Lender and The Borrower agree as follows:

1.      AMOUNTS DUE AND OWING

1.1     In consideration of the loan being made by The Lender to The Borrower, The Borrower agrees to pay to The Lender the sum of Ten Thousand Dollars (10,000) USD (the "Principal Sum") of lawful money of The United States of America, together with all interest, penalties and assessments that may from time to time be added to the Principal Sum and are provided for in this Agreement. For the purposes of this Agreement, the Principal Sum, together with all interest, penalties and assessment that may from time to time be added to the Principal Sum as provided for herein shall be referred to as the "Debt".

2. PAYMENT DUE

2.1   The whole of the Debt hereby secured shall become immediately due and payable at 2:00 p.m. (Vancouver time) November 15,2005, or unless waived by The Lender, upon default of payment of the Debt by The Borrower to The Lender. Waiver of or failure by the Lender to enforce at any time or from time to time to any of the rights extended to him by this Agreement shall not prejudice the Lender's rights in the event of any future default or breach.

3. INTEREST

3.1   In addition to the payment of the Principal Sum the Borrower agrees to pay to The Lender interest calculated at the rate of 10% per annum.

4. RIGHT TO PREPAY; INTERIM PAYMENT; PENALTIES

4.1   The Borrower shall have the privilege of pre-paying the Debt to The Lender, subject to the provisions that The Borrower pay to the Lender not less than the sum of $10,000.

4.2   If the Debt is repaid to The Lender by The Borrower at any time prior to November 15,2005, then The Borrower will be released from any further or continued obligations under this loan agreement.

5. PAYMENT OF COSTS

5.1   The Borrower shall pay for all reasonable costs, charges and expenses, including solicitor's costs, charges and expenses, which may be incurred by The Lender in collecting, procuring or enforcing payments of any monies in connection with this Note.

5.0 CONVERSION TO EQUITY

5.1   In the alternative to the repayment of those monies described in paragraph 1 hereof and at the option of the Lender and following notice to the Borrower as provided herein, the payment of the Loan outstanding from time to time, together with any accrued interest thereon (hereinafter collectively called the "Debt") shall be converted to equity in the capital stock of the Company by the allotment and issuance to the Lender of common shares in the share capital of the corporation equal to the value of the Debt.

5.2   If the Lender shall elect to convert the Debt into shares, the Lender shall give notice thereof to the Borrower at its office establishing a record date for conversion of the Debt for shares (the "Conversion Date").

5.3   Upon notice being given pursuant to this section, the Company shall provide the Lender with a Subscription Agreement to be executed for the common shares in the

Company for consideration according to the Conversion Rate which be negotiated at the Conversion Date.

5.4    On or after the Conversion Date, the Company shall as soon as practicable deliver to the Lender share certificates in amounts equivalent to the Debt calculated in accordance with the Conversion Rate

## 6    SECURITY

6.1    As security for payment of the principal and interest and of other monies which may become payable hereunder and for the performance and observance of all the obligations and covenants of the Company herein contained, the Company hereby charges as and by way of a floating charge in favour of the Lender all its properties, assets, effects and undertakings, including without limiting the generality of the foregoing all its undertaking, business, goodwill, chattels, inventories or raw materials, work in progress and finished products, book accounts, rents, revenues, incomes, monies, credits, policies, notes and generally all its assets both present and future of which whatsoever and wheresoever situate including its uncalled capital but, except as hereinafter provided, such floating charge shall in no way hinder or prevent the Company, until the security hereby constituted shall have become enforceable and the Lender shall have determined or become bound to enforce it, from selling, disposing of or otherwise dealing with any and all of the subject matter of such floating charge in the ordinary course of the Borrower's business and for the purpose of carrying on and extending the same; PROVIDED, however, that the Company shall not, unless it has the express written consent of the Lender, grant, create, assume or permit to exist any mortgage, pledge, charge, assignment, lease, lien or other security, whether fixed or floating, upon the whole or any part of the Mortgage Property, whether or not advances made on the security hereof are or may be made before or after advances made on such mortgage, pledge, charge, assignment, lease, lien or security.

6.2    "Mortgaged Property" wherever used herein means and includes all property and assets, present and future, of the Company expressed herein or in any instruments supplemental hereto or in implement hereof to be charged for or with the payment of the monies intended to be secured hereby

## 7.    COVENANTS OF THE BORROWER

7.1    The Borrower promises and agrees with the Lender, his successors and assigns as follows;

    (a)    to pay, or cause to be paid the whole of the Debt to the Lender;

    (b)    to adopt and agree with the Lender to perform and observe each and every covenant and provision agreed to be performed and observed by The Borrower.

8.    REPRESENTATIONS, WARRANTIES AND COVENANTS

8.1    The Borrower represents and warrants to The Lender that all matters and things have been done and performed so as to authorize and make the creation of this Agreement and its execution legal and valid and in accordance with the requirements of the laws relating to The Borrower and all other statutes and laws in that regard;

8.2    At all times during the continuance of this Agreement, the Borrower shall execute and deliver to The Lender any further assurances and do such things that The Lender may require to perfect the security contemplated by this Agreement.

9.    FORM OF PAYMENT

9.1    All monies paid to The Lender by The Borrower shall be paid in lawful money of Canada and shall be made payable to The Lender at the address of The Lender set out on the first page of this Agreement, or such other place that The Lender may advise The Borrower in writing.

10.    NOTICE

10.1    Any notice to The Borrower in connection with this Agreement shall be well and sufficiently given if sent by prepaid registered mail to or delivered to The Borrower at the address set out on the first page of this Agreement and any notice so give shall be deemed to have been given if delivered, when delivered, and if mailed, on the third business day following the day on which it was mailed.

10.2    Any notice to The Lender in connection with this Agreement shall be well and sufficiently given if sent by prepaid registered mail to or delivered to The Lender at suite 440-375 Water Street Vancouver, B.C., V6E 1T7, and any notice given shall be deemed to have been give, if delivered, and if mailed, on the third business day following the day on this it was mailed.

10.3    The Borrower or The Lender may, by notice given in the manner herein described, change the postal address for the giving of notices given hereunder.

11    JURISDICTION

11.1    This Agreement shall be governed by and construed in accordance with the laws of the province of British Columbia.

12.    ENUREMENT

12.1    This Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

13.     TIME

13.1    Time is of the essence of this Agreement.

14.     ASSIGNMENT

14.1    The Lender is entitled to transfer and assign the benefits, rights and obligations to which he is entitled under this Agreement to any person or party. In the event such an assignment occurs, written notice must be given to The Borrower and the party to whom the benefits, rights and obligations have been assigned shall be deemed to be a party to this Agreement.

IN WITNESS WHEREOF the parties hereto have set their hands and seals the day and year first above written.

NEWMARK VENRURES, INC.          )
                                )
                                )
                                )  _____
                                )     Authorized Signatory
                                )
in the presence of              )
                                )
                                )
_____
Witness


LESLIE LOUNSBURY               )
                               )  _____
                               )     LESLIE LOUNSBURY
                               )
                               )
in the presence of             )
                               )
_____
Witness

**Exhibit "E"**

CONVERTIBLE LOAN AGREEMENT

THIS AGREEMENT dated the 25TH Day of November 2004.

BETWEEN:

> NEWMARK VENTURES, INC., having offices located at 440-375 Water Street, Vancouver, British Columbia, V6E 2P4
>
> (herein referred to as "The Borrower or The Company")

AND:

> LESLIE LOUNSBURY
>
> (herein referred to as "The Lender")

WHEREAS:

A.     The Borrower has requested that The Lender provide the borrower with a loan in the amount of Six Thousand Five Hundred Dollars ($6,500) USD for working capital and,

B.     The Lender has agreed to loan to The Borrower the sum of Six Thousand Five Hundred Dollars ($6,500) USD and The Borrower has agreed to accept that sum as a loan from The Lender; and,

C.     The parties hereto are desirous of clarifying the nature of the loan transaction and have therefore agreed to the terms herein.

NOW THEREFORE THIS AGREEMENT WITNESSES that in consideration of the premises and mutual covenants and agreements hereinafter set forth, The Lender and The Borrower agree as follows:

1.     AMOUNTS DUE AND OWING

1.1     In consideration of the loan being made by The Lender to The Borrower, The Borrower agrees to pay to The Lender the sum of Six Thousand Five Hundred Dollars ($6,500) USD (the "Principal Sum") of lawful money of The United States of America, together with all interest, penalties and assessments that may from time to time be added to the Principal Sum and are provided for in this Agreement.  For the purposes of this Agreement, the Principal Sum, together with all interest, penalties and assessment that may from time to time be added to the Principal Sum as provided for herein shall be referred to as the "Debt".

2.      PAYMENT DUE

2.1     The whole of the Debt hereby secured shall become immediately due and payable at 2:00 p.m. (Vancouver time) November 30,2005, or unless waived by The Lender, upon default of payment of the Debt by The Borrower to The Lender. Waiver of or failure by the Lender to enforce at any time or from time to time to any of the rights extended to him by this Agreement shall not prejudice the Lender's rights in the event of any future default or breach.

3.      INTEREST

3.1     In addition to the payment of the Principal Sum  the Borrower agrees to pay to The Lender interest calculated at the rate of 10% per annum.

4.      RIGHT TO PREPAY; INTERIM PAYMENT; PENALTIES

4.1     The Borrower shall have the privilege of pre-paying the Debt to The Lender, subject to the provisions that The Borrower pay to the Lender not less than the sum of $6,500.

4.2     If the Debt is repaid to The Lender by The Borrower at any time prior to November 30,2005, then The Borrower will be released from any further or continued obligations under this loan agreement.

5.      PAYMENT OF COSTS

5.1     The Borrower shall pay for all reasonable costs, charges and expenses, including solicitor's costs, charges and expenses, which may be incurred by The Lender in collecting, procuring or enforcing payments of any monies in connection with this Note.

5.0     CONVERSION TO EQUITY

5.1     In the alternative to the repayment of those monies described in paragraph 1 hereof and at the option of the Lender and following notice to the Borrower as provided herein, the payment of the Loan outstanding from time to time, together with any accrued interest thereon (hereinafter collectively called the "Debt") shall be converted to equity in the capital stock of the Company by the allotment and issuance to the Lender of common shares in the share capital of the corporation equal to the value of the Debt.

5.2     If the Lender shall elect to convert the Debt into shares, the Lender shall give notice thereof to the Borrower at its office establishing a record date for conversion of the Debt for shares (the "Conversion Date").

5.3     Upon notice being given pursuant to this section, the Company shall provide the Lender with a Subscription Agreement to be executed for the common shares in the

Company for consideration according to the Conversion Rate which be negotiated at the Conversion Date.

5.4     On or after the Conversion Date, the Company shall as soon as practicable deliver to the Lender share certificates in amounts equivalent to the Debt calculated in accordance with the Conversion Rate

6     SECURITY

6.1     As security for payment of the principal and interest and of other monies which may become payable hereunder and for the performance and observance of all the obligations and covenants of the Company herein contained, the Company hereby charges as and by way of a floating charge in favour of the Lender all its properties, assets, effects and undertakings, including without limiting the generality of the foregoing all its undertaking, business, goodwill, chattels, inventories or raw materials, work in progress and finished products, book accounts, rents, revenues, incomes, monies, credits, policies, notes and generally all its assets both present and future of which whatsoever and wheresoever situate including its uncalled capital but, except as hereinafter provided, such floating charge shall in no way hinder or prevent the Company, until the security hereby constituted shall have become enforceable and the Lender shall have determined or become bound to enforce it, from selling, disposing of or otherwise dealing with any and all of the subject matter of such floating charge in the ordinary course of the Borrower's business and for the purpose of carrying on and extending the same; PROVIDED, however, that the Company shall not, unless it has the express written consent of the Lender, grant, create, assume or permit to exist any mortgage, pledge, charge, assignment, lease, lien or other security, whether fixed or floating, upon the whole or any part of the Mortgage Property, whether or not advances made on the security hereof are or may be made before or after advances made on such mortgage, pledge, charge, assignment, lease, lien or security.

6.2     "Mortgaged Property" wherever used herein means and includes all property and assets, present and future, of the Company expressed herein or in any instruments supplemental hereto or in implement hereof to be charged for or with the payment of the monies intended to be secured hereby

7.     COVENANTS OF THE BORROWER

7.1     The Borrower promises and agrees with the Lender, his successors and assigns as follows;

        (a)     to pay, or cause to be paid the whole of the Debt to the Lender;

        (b)     to adopt and agree with the Lender to perform and observe each and every covenant and provision agreed to be performed and observed by The Borrower.

8.    REPRESENTATIONS, WARRANTIES AND COVENANTS

8.1    The Borrower represents and warrants to The Lender that all matters and things have been done and performed so as to authorize and make the creation of this Agreement and its execution legal and valid and in accordance with the requirements of the laws relating to The Borrower and all other statutes and laws in that regard;

8.2    At all times during the continuance of this Agreement, the Borrower shall execute and deliver to The Lender any further assurances and do such things that The Lender may require to perfect the security contemplated by this Agreement.

9.    FORM OF PAYMENT

9.1    All monies paid to The Lender by The Borrower shall be paid in lawful money of Canada and shall be made payable to The Lender at the address of The Lender set out on the first page of this Agreement, or such other place that The Lender may advise The Borrower in writing.

10.    NOTICE

10.1    Any notice to The Borrower in connection with this Agreement shall be well and sufficiently given if sent by prepaid registered mail to or delivered to The Borrower at the address set out on the first page of this Agreement and any notice so give shall be deemed to have been given if delivered, when delivered, and if mailed, on the third business day following the day on which it was mailed.

10.2    Any notice to The Lender in connection with this Agreement shall be well and sufficiently given if sent by prepaid registered mail to or delivered to The Lender at suite 440-375 Water Street Vancouver, B.C., V6E 1T7, and any notice given shall be deemed to have been give, if delivered, and if mailed, on the third business day following the day on this it was mailed.

10.3    The Borrower or The Lender may, by notice given in the manner herein described, change the postal address for the giving of notices given hereunder.

11    JURISDICTION

11.1    This Agreement shall be governed by and construed in accordance with the laws of the province of British Columbia.

12.    ENUREMENT

121    This Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

13.   TIME

13.1   Time is of the essence of this Agreement.

14.   ASSIGNMENT

14.1   The Lender is entitled to transfer and assign the benefits, rights and obligations to which he is entitled under this Agreement to any person or party.  In the event such an assignment occurs, written notice must be given to The Borrower and the party to whom the benefits, rights and obligations have been assigned shall be deemed to be a party to this Agreement.

IN WITNESS WHEREOF the parties hereto have set their hands and seals the day and year first above written.

NEWMARK VENRURES, INC.                )
                                      )
                                      )
                                      ) _____
                                      )   Authorized Signatory
                                      )
in the presence of                    )
                                      )
                                      )
_____      )
Witness


LESLIE LOUNSBURY                      )
                                      ) _____
                                      )   LESLIE LOUNSBURY
                                      )
in the presence of                    )
                                      )
                                      )
_____      )
Witness

Exhibit "F"

## CONVERTIBLE LOAN AGREEMENT

THIS AGREEMENT dated the 16TH Day of December 2004.

BETWEEN:

> NEWMARK VENTURES, INC., having offices located at 440-375 Water Street, Vancouver, British Columbia, V6E 2P4
>
> (herein referred to as "The Borrower or The Company")

AND:

> LESLIE LOUNSBURY
>
> (herein referred to as "The Lender")

WHEREAS:

A.      The Borrower has requested that The Lender provide the borrower with a loan in the amount of Twenty Thousand Dollars (20,000) USD for working capital and,

B.      The Lender has agreed to loan to The Borrower the sum of Twenty Thousand Dollars (20,000) USD and The Borrower has agreed to accept that sum as a loan from The Lender; and,

C.      The parties hereto are desirous of clarifying the nature of the loan transaction and have therefore agreed to the terms herein.

NOW THEREFORE THIS AGREEMENT WITNESSES that in consideration of the premises and mutual covenants and agreements hereinafter set forth, The Lender and The Borrower agree as follows:

1.      AMOUNTS DUE AND OWING

1.1      In consideration of the loan being made by The Lender to The Borrower, The Borrower agrees to pay to The Lender the sum of Twenty Thousand Dollars (20,000) USD (the "Principal Sum") of lawful money of The United States of America, together with all interest, penalties and assessments that may from time to time be added to the Principal Sum and are provided for in this Agreement.  For the purposes of this Agreement, the Principal Sum, together with all interest, penalties and assessment that may from time to time be added to the Principal Sum as provided for herein shall be referred to as the "Debt".

2.     PAYMENT DUE

2.1     The whole of the Debt hereby secured shall become immediately due and payable at 2:00 p.m. (Vancouver time) December 16,2005, or unless waived by The Lender, upon default of payment of the Debt by The Borrower to The Lender. Waiver of or failure by the Lender to enforce at any time or from time to time to any of the rights extended to him by this Agreement shall not prejudice the Lender's rights in the event of any future default or breach.

3.     INTEREST

3.1     In addition to the payment of the Principal Sum  the Borrower agrees to pay to The Lender interest calculated at the rate of 10% per annum.

4.     RIGHT TO PREPAY; INTERIM PAYMENT;  PENALTIES

4.1     The Borrower shall have the privilege of pre-paying the Debt to The Lender, subject to the provisions that The Borrower pay to the Lender not less than the sum of $20,000.

4.2     If the Debt is repaid to The Lender by The Borrower at any time prior to December 16,2005, then The Borrower will be released from any further or continued obligations under this loan agreement.

5.     PAYMENT OF COSTS

5.1     The Borrower shall pay for all reasonable costs, charges and expenses, including solicitor's costs, charges and expenses, which may be incurred by The Lender in collecting, procuring or enforcing payments of any monies in connection with this Note.

5.0     CONVERSION TO EQUITY

5.1     In the alternative to the repayment of those monies described in paragraph 1 hereof and at the option of the Lender and following notice to the Borrower as provided herein, the payment of the Loan outstanding from time to time, together with any accrued interest thereon (hereinafter collectively called the "Debt") shall be converted to equity in the capital stock of the Company by the allotment and issuance to the Lender of common shares in the share capital of the corporation equal to the value of the Debt.

5.2     If the Lender shall elect to convert the Debt into shares, the Lender shall give notice thereof to the Borrower at its office establishing a record date for conversion of the Debt for shares (the "Conversion Date").

5.3     Upon notice being given pursuant to this section, the Company shall provide the Lender with a Subscription Agreement to be executed for the common shares in the

Company for consideration according to the Conversion Rate which be negotiated at the Conversion Date.

5.4     On or after the Conversion Date, the Company shall as soon as practicable deliver to the Lender share certificates in amounts equivalent to the Debt calculated in accordance with the Conversion Rate

6       SECURITY

6.1     As security for payment of the principal and interest and of other monies which may become payable hereunder and for the performance and observance of all the obligations and covenants of the Company herein contained, the Company hereby charges as and by way of a floating charge in favour of the Lender all its properties, assets, effects and undertakings, including without limiting the generality of the foregoing all its undertaking, business, goodwill, chattels, inventories or raw materials, work in progress and finished products, book accounts, rents, revenues, incomes, monies, credits, policies, notes and generally all its assets both present and future of which whatsoever and wheresoever situate including its uncalled capital but, except as hereinafter provided, such floating charge shall in no way hinder or prevent the Company, until the security hereby constituted shall have become enforceable and the Lender shall have determined or become bound to enforce it, from selling, disposing of or otherwise dealing with any and all of the subject matter of such floating charge in the ordinary course of the Borrower's business and for the purpose of carrying on and extending the same; PROVIDED, however, that the Company shall not, unless it has the express written consent of the Lender, grant, create, assume or permit to exist any mortgage, pledge, charge, assignment, lease, lien or other security, whether fixed or floating, upon the whole or any part of the Mortgage Property, whether or not advances made on the security hereof are or may be made before or after advances made on such mortgage, pledge, charge, assignment, lease, lien or security.

6.2     "Mortgaged Property" wherever used herein means and includes all property and assets, present and future, of the Company expressed herein or in any instruments supplemental hereto or in implement hereof to be charged for or with the payment of the monies intended to be secured hereby

7.      COVENANTS OF THE BORROWER

7.1     The Borrower promises and agrees with the Lender, his successors and assigns as follows;

        (a)     to pay, or cause to be paid the whole of the Debt to the Lender;

        (b)     to adopt and agree with the Lender to perform and observe each and every covenant and provision agreed to be performed and observed by The Borrower.

8.      REPRESENTATIONS, WARRANTIES AND COVENANTS

8.1     The Borrower represents and warrants to The Lender that all matters and things have been done and performed so as to authorize and make the creation of this Agreement and its execution legal and valid and in accordance with the requirements of the laws relating to The Borrower and all other statutes and laws in that regard;

8.2     At all times during the continuance of this Agreement, the Borrower shall execute and deliver to The Lender any further assurances and do such things that The Lender may require to perfect the security contemplated by this Agreement.

9.      FORM OF PAYMENT

9.1     All monies paid to The Lender by The Borrower shall be paid in lawful money of Canada and shall be made payable to The Lender at the address of The Lender set out on the first page of this Agreement, or such other place that The Lender may advise The Borrower in writing.

10.     NOTICE

10.1    Any notice to The Borrower in connection with this Agreement shall be well and sufficiently given if sent by prepaid registered mail to or delivered to The Borrower at the address set out on the first page of this Agreement and any notice so give shall be deemed to have been given if delivered, when delivered, and if mailed, on the third business day following the day on which it was mailed.

10.2    Any notice to The Lender in connection with this Agreement shall be well and sufficiently given if sent by prepaid registered mail to or delivered to The Lender at suite 440-375 Water Street Vancouver, B.C., V6E 1T7, and any notice given shall be deemed to have been give, if delivered, and if mailed, on the third business day following the day on this it was mailed.

10.3    The Borrower or The Lender may, by notice given in the manner herein described, change the postal address for the giving of notices given hereunder.

11      JURISDICTION

11.1    This Agreement shall be governed by and construed in accordance with the laws of the province of British Columbia.

12.     ENUREMENT

121   This Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

13.   TIME

13.1   Time is of the essence of this Agreement.

14.   ASSIGNMENT

14.1   The Lender is entitled to transfer and assign the benefits, rights and obligations to which he is entitled under this Agreement to any person or party. In the event such an assignment occurs, written notice must be given to The Borrower and the party to whom the benefits, rights and obligations have been assigned shall be deemed to be a party to this Agreement.

IN WITNESS WHEREOF the parties hereto have set their hands and seals the day and year first above written.

NEWMARK VENRURES, INC.                )
                                       )
                                       )
                                       )   Authorized Signatory
                                       )
in the presence of                     )
                                       )
                                       )
_____
Witness


LESLIE LOUNSBURY                       )
                                       )   LESLIE LOUNSBURY
                                       )
                                       )
in the presence of                     )
                                       )
                                       )
_____
Witness

**Exhibit "G"**

CONVERTIBLE LOAN AGREEMENT

THIS AGREEMENT dated the 4th Day of March 2005.

BETWEEN:

> NEWMARK VENTURES, INC., having offices located at 440-375 Water Street, Vancouver, British Columbia, V6E 2P4
>
> (herein referred to as "The Borrower or The Company")

AND:

> LESLIE LOUNSBURY
>
> (herein referred to as "The Lender")

WHEREAS:

A.      The Borrower has requested that The Lender provide the borrower with a loan in the amount of Ten Thousand Dollars ($10,000) CDN for working capital and,

B.      The Lender has agreed to loan to The Borrower the sum of Ten Thousand Dollars ($10,000) CDN and The Borrower has agreed to accept that sum as a loan from The Lender; and,

C.      The parties hereto are desirous of clarifying the nature of the loan transaction and have therefore agreed to the terms herein.

NOW THEREFORE THIS AGREEMENT WITNESSES that in consideration of the premises and mutual covenants and agreements hereinafter set forth, The Lender and The Borrower agree as follows:

1.      AMOUNTS DUE AND OWING

1.1      In consideration of the loan being made by The Lender to The Borrower, The Borrower agrees to pay to The Lender the sum of Ten Thousand Dollars ($10,000) CDN (the "Principal Sum") together with all interest, penalties and assessments that may from time to time be added to the Principal Sum and are provided for in this Agreement.  For the purposes of this Agreement, the Principal Sum, together with all interest, penalties and assessment that may from time to time be added to the Principal Sum as provided for herein shall be referred to as the "Debt".

2.    PAYMENT DUE

2.1    The whole of the Debt hereby secured shall become immediately due and payable at 2:00 p.m. (Vancouver time) March 4, 2006, or unless waived by The Lender, upon default of payment of the Debt by The Borrower to The Lender. Waiver of or failure by the Lender to enforce at any time or from time to time to any of the rights extended to him by this Agreement shall not prejudice the Lender's rights in the event of any future default or breach.

3.    INTEREST

3.1    In addition to the payment of the Principal Sum  the Borrower agrees to pay to The Lender interest calculated at the rate of 10% per annum.

4.    RIGHT TO PREPAY; INTERIM PAYMENT;  PENALTIES

4.1    The Borrower shall have the privilege of pre-paying the Debt to The Lender, subject to the provisions that The Borrower pay to the Lender not less than the sum of Ten Thousand Dollars ($10,000) CDN.

4.2    If the Debt is repaid to The Lender by The Borrower at any time prior to March 4, 2006, then The Borrower will be released from any further or continued obligations under this loan agreement.

5.    PAYMENT OF COSTS

5.1    The Borrower shall pay for all reasonable costs, charges and expenses, including solicitor's costs, charges and expenses, which may be incurred by The Lender in collecting, procuring or enforcing payments of any monies in connection with this Note.

5.0    CONVERSION TO EQUITY

5.1    In the alternative to the repayment of those monies described in paragraph 1 hereof and at the option of the Lender and following notice to the Borrower as provided herein, the payment of the Loan outstanding from time to time, together with any accrued interest thereon (hereinafter collectively called the "Debt") shall be converted to equity in the capital stock of the Company by the allotment and issuance to the Lender of common shares in the share capital of the corporation equal to the value of the Debt.

5.2    If the Lender shall elect to convert the Debt into shares, the Lender shall give notice thereof to the Borrower at its office establishing a record date for conversion of the Debt for shares (the "Conversion Date").

5.3    Upon notice being given pursuant to this section, the Company shall provide the Lender with a Subscription Agreement to be executed for the common shares in the

Company for consideration according to the Conversion Rate which be negotiated at the Conversion Date.

5.4     On or after the Conversion Date, the Company shall as soon as practicable deliver to the Lender share certificates in amounts equivalent to the Debt calculated in accordance with the Conversion Rate

## 6     SECURITY

6.1     As security for payment of the principal and interest and of other monies which may become payable hereunder and for the performance and observance of all the obligations and covenants of the Company herein contained, the Company hereby charges as and by way of a floating charge in favour of the Lender all its properties, assets, effects and undertakings, including without limiting the generality of the foregoing all its undertaking, business, goodwill, chattels, inventories or raw materials, work in progress and finished products, book accounts, rents, revenues, incomes, monies, credits, policies, notes and generally all its assets both present and future of which whatsoever and wheresoever situate including its uncalled capital but, except as hereinafter provided, such floating charge shall in no way hinder or prevent the Company, until the security hereby constituted shall have become enforceable and the Lender shall have determined or become bound to enforce it, from selling, disposing of or otherwise dealing with any and all of the subject matter of such floating charge in the ordinary course of the Borrower's business and for the purpose of carrying on and extending the same; PROVIDED, however, that the Company shall not, unless it has the express written consent of the Lender, grant, create, assume or permit to exist any mortgage, pledge, charge, assignment, lease, lien or other security, whether fixed or floating, upon the whole or any part of the Mortgage Property, whether or not advances made on the security hereof are or may be made before or after advances made on such mortgage, pledge, charge, assignment, lease, lien or security.

6.2     "Mortgaged Property" wherever used herein means and includes all property and assets, present and future, of the Company expressed herein or in any instruments supplemental hereto or in implement hereof to be charged for or with the payment of the monies intended to be secured hereby

## 7.     COVENANTS OF THE BORROWER

7.1     The Borrower promises and agrees with the Lender, his successors and assigns as follows;

      (a)     to pay, or cause to be paid the whole of the Debt to the Lender;

      (b)     to adopt and agree with the Lender to perform and observe each and every covenant and provision agreed to be performed and observed by The Borrower.

8.   REPRESENTATIONS, WARRANTIES AND COVENANTS

8.1   The Borrower represents and warrants to The Lender that all matters and things have been done and performed so as to authorize and make the creation of this Agreement and its execution legal and valid and in accordance with the requirements of the laws relating to The Borrower and all other statutes and laws in that regard;

8.2   At all times during the continuance of this Agreement, the Borrower shall execute and deliver to The Lender any further assurances and do such things that The Lender may require to perfect the security contemplated by this Agreement.

9.   FORM OF PAYMENT

9.1   All monies paid to The Lender by The Borrower shall be paid in lawful money of Canada and shall be made payable to The Lender at the address of The Lender set out on the first page of this Agreement, or such other place that The Lender may advise The Borrower in writing.

10.   NOTICE

10.1   Any notice to The Borrower in connection with this Agreement shall be well and sufficiently given if sent by prepaid registered mail to or delivered to The Borrower at the address set out on the first page of this Agreement and any notice so give shall be deemed to have been given if delivered, when delivered, and if mailed, on the third business day following the day on which it was mailed.

10.2   Any notice to The Lender in connection with this Agreement shall be well and sufficiently given if sent by prepaid registered mail to or delivered to The Lender at suite 440-375 Water Street Vancouver, B.C., V6E 1T7, and any notice given shall be deemed to have been give, if delivered, and if mailed, on the third business day following the day on this it was mailed.

10.3   The Borrower or The Lender may, by notice given in the manner herein described, change the postal address for the giving of notices given hereunder.

11   JURISDICTION

11.1   This Agreement shall be governed by and construed in accordance with the laws of the province of British Columbia.

12.   ENUREMENT

121   This Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

13.   TIME

13.1   Time is of the essence of this Agreement.

14.   ASSIGNMENT

14.1   The Lender is entitled to transfer and assign the benefits, rights and obligations to which he is entitled under this Agreement to any person or party.  In the event such an assignment occurs, written notice must be given to The Borrower and the party to whom the benefits, rights and obligations have been assigned shall be deemed to be a party to this Agreement.

IN WITNESS WHEREOF the parties hereto have set their hands and seals the day and year first above written.

NEWMARK VENRURES, INC.                )
                                       )
                                       )
                                       )   _____
                                       )   Authorized Signatory
                                       )
in the presence of                     )
                                       )
                                       )
_____            )
Witness


LESLIE LOUNSBURY                       )
                                       )   _____
                                       )   LESLIE LOUNSBURY
                                       )
in the presence of                     )
                                       )
                                       )
_____            )
Witness

**Exhibit "H"**

## DEBT SETTLEMENT AGREEMENT

THIS AGREEMENT is made as of the 30th day of September 2005

BETWEEN:

> NEWMARK VENTURES, INC., a Delaware company having an office at
> Suite 440 – 375 Water Street, Vancouver, B.C., Canada, V6B 5C6

> (the "Company")

OF THE FIRST PART

AND:

> LESLIE LOUNSBURY

> (the "Creditor")

OF THE SECOND PART

WHEREAS:

A. The Company is indebted to the Creditor in the amount of USD $54,826.85 (the "Debt");

B. The Company has agreed to pay to the Creditor, Twenty Five Thousand dollars (USD $25,000), issue 30,000 shares of Common Stock, par value $.001 (the **"Common Stock"**) and two warrants (the **"Warrants"**). One Warrant entitles the holder to purchase 30,000 shares of Common Stock on or before September 30, 2006, at an exercise price of $2.00 per share, and the second Warrant entitles the holder to purchase 30,000 shares of Common Stock on or before September 30, 2007, at an exercise price of $3.00 per share;

C. The Creditor has agreed to accept USD $25,000, the Common Stock and the Warrants from the Company in total satisfaction of the Debt.

THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth in this Agreement, the parties agree as follows:

1.00   Debt Settlement

1.01   The Company will pay and satisfy the Debt by delivering a cheque or bank draft in the amount of $25,000.

1.02   Issuing the Common Stock to the Creditor at a deemed price of US$1.00 per share for an aggregate amount equal to the Debt payable on September 30th, 2005. The Common stock will be issued in reliance upon the exemption from securities registration pursuant to Section 4(2) and/or Regulation S promulgated by the U.S. Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the **"1933 Act"**).

1.03   Issuing the Warrants to the Creditor.

1.04   The Creditor acknowledges and agrees that all outstanding accounts have been rendered by the Creditor to the Company to the date of this Agreement and upon receipt of the USD $25,000 payment,

the issuance Common Stock and the Warrants to/by the Creditor there will be no outstanding liability of the Company to the Creditor.

2.00   Headings

2.01   The headings and section references in this Agreement are for convenience of reference only and do not form a part of this Agreement and are not intended to interpret, define or limit the scope, extent or intent of this Agreement or any provision thereof.

3.00   Governing Law

3.01   This Agreement and all matters arising hereunder shall be governed by, construed and enforced in accordance with the laws of the State of Delaware and all disputes arising under this Agreement shall be referred to, and the parties attorn to the jurisdiction of, the courts of appropriate jurisdiction in the State of Delaware.

4.00   Enurement

4.01   This Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

5.00   Carrying Out Agreement

5.01   Each of the parties hereto hereby covenants and agrees to execute such further and other documents and instruments and do such other things as may be necessary to implement and carry out the intent of this Agreement.

6.00   Assignment

6.01   This Agreement shall not be assignable by the Creditor without the written consent of the Company.

7.00   Counterparts

7.01   This Agreement, or any amendment to it, may be executed in counterparts, each of which will be deemed an original agreement and all of which will together constitute one agreement.

8.00   Amendment

8.01   Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Agreement shall be binding upon the parties hereto unless reduced to writing and signed by the parties.


IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the day and year first above written.

NEWMARK VENTURES, INC.

Per: _____

Roderick Shand, President

Per: _____
Leslie Lounsbury

Exhibit "I"

## ADVERTISING AGREEMENT

THIS AGREEMENT dated the 30th Day of September 2005.

BETWEEN:

RIVERSIDE MANITOBA, INC., having offices located at 440-375 Water Street, Vancouver, British Columbia, V6E 2P4

(herein referred to as "The Advertiser ")

AND:

MANGAPETS INC., a Delaware corporation with principal address at Suite 440-375 Water Street, Vancouver, B.C. V6B 5C6

(herein referred to as "The Company")

RECITALS

WHEREAS, Company is engaged in the business of providing Internet products and services, including advertising services; and

WHEREAS, Advertiser desires to purchase advertising services from Company as specified in this Agreement;

NOW, THEREFORE, the parties agree to the following terms and conditions:

1. DEFINITIONS.

(a) "Advertisement" means the text, possible web link, and/or graphic (GIF or JPEG) file or file of such other format as Company may designate from time to time, supplied by Advertiser to be published by Company on Company's Web Site and which may contain a link to Advertiser's web site or to a web site specified by Advertiser.

(b) "Advertising Program" means an Advertiser's particular selection and purchase of advertising space and services for publication of its Advertisements on Company's Web Site.

(c) "Company's Web Site" means a collection of HTML documents accessible by the public via the Internet at the Universal Resource Locator ("URL") http://www.mangapets.com, or such other URL as may be designated from time to time in writing by Company.

(d) "Rate Card" means the information regarding Company advertising services, rates, and technical requirements for Advertiser Submissions for publication on Company's Web Site, a copy of which Rate Card may be attached hereto.

(e) "Advertiser Submission" means all information and items necessary for Company's publication of Advertiser's Advertisements, including initial Advertising Program information, Advertisements, changes and updates to Advertisements, and replacement or new Advertisements.

(f) "Effective Date" means the date the Company's web portal and web site www.mangapets.com is developed and becomes fully functional as defined in the Company's Portal Development Agreement dated July 15, 2005  with Sygenics Interactive Inc. ("Sygenics")

2. COMPANY SERVICES.

(a) Advertising Services. Company will publish Advertiser's Advertisements on Company's Web Site according to the level of service selected from the Rate Card or Advertising Program. Advertiser shall retain all right, title and interest in and to its Advertisements (including the copyright ownership thereof), and Advertiser hereby grants Company a royalty-free worldwide license, without payment or other charge therefore, to use, display, perform, reproduce and distribute the Advertisements, and such other licenses with respect to the Advertisements necessary to fulfill the intention of this Agreement.

(b) According to the ad(s) chosen, Advertisements are based on location on Company's web site or based on number of page views or a combination of both.

(c) No Warranty. Company may at its sole discretion provide reports to Advertiser. Company makes no warranty, express or implied, as to any matter, including, without limitation, the Advertising Program and other services provided hereunder or their accuracy. Company expressly disclaims the warranties of Non-Infringement, Merchantability, and Fitness for any Particular Purpose.

(d)Status reports: MangaPets Inc. will provide the Advertiser with a URL that displays total site page views upon request.  MangaPets Inc. does not and cannot make any representation or warranty as to the number, frequency or duration of any such page views.


3. ADVERTISER SUBMISSIONS.

(a) Submission Deadline. Company must receive all Advertiser Submissions at least five (5) business days prior to the scheduled date of publication for each relevant Advertisement ("Submission Deadline").

(b) Changes and Cancellations. All changes to and/or cancellations of Advertiser Submissions must be made in writing and received by Company prior to the Submission Deadline.

(c) Rejections. Company may, in its complete discretion, refuse at any time, prior to or during publication, for any reason to accept any Advertiser Submission and/or to publish any Advertisement. [In the event Company exercises such discretion, Company shall refund the applicable pro rata portion of fees paid for advertising services not yet provided.]

4. ADVERTISER WARRANTY AND INDEMNIFICATION.

(a) Advertiser Warranty. Advertiser hereby represents and warrants to Company:

(i) No Infringement. Advertiser's Advertisements do not now, and will not, violate any criminal laws or any rights of any third parties, including, but not limited to, infringement or misappropriation of any copyright, patent, trademark, trade secret, music, image, or other proprietary or property right, false advertising, unfair competition, defamation, invasion of privacy or rights of celebrity, violation of any antidiscrimination law or regulation, or any other right of any person or entity.
(ii) No Objectionable Content. Advertiser's Advertisements do not now, and will not, include any material that is: unlawful, harmful, fraudulent, threatening, abusive, harassing, defamatory, vulgar, obscene, profane, hateful, racially, ethnically or otherwise objectionable, including, without limitation, any material that encourages conduct that would constitute a criminal offense, give rise to civil liability, or otherwise violate any applicable local, state, national or international law.

(b) Indemnification. Advertiser shall indemnify and hold Company, its officers agents, directors, employees and distributors harmless from and against all actions, claims, damages, costs and expenses (including attorney's fees) arising out of or with respect to: (i) any breach of the foregoing warranties; or (ii) any other third party claim in connection with Advertiser's Advertisements.

5. ADVERTISING PAYMENTS.

Advertiser shall pay Company according to the prices and terms listed in the Rate Card or as specified in the Advertising Program or as agreed upon.

6. CONFIDENTIALITY.
(a) Defined. "Confidential Information" will mean: (i) Advertisements, prior to publication, (ii) any Company Web Site statistics, such as number of visitors/unique viewers, page views, etc., which shall be considered Company's Confidential Information, and (iii) any information designated in writing by the disclosing party as "confidential" or "proprietary."

(b) Obligations. During the term of this Agreement and for a period of three (3) years thereafter, neither party will use or disclose any Confidential Information of the other party except as specifically contemplated herein. The foregoing restrictions will not apply to information that (i) has been independently developed by the receiving party, (ii) has

become publicly known through no wrongful act of the receiving party, (iii) has been rightfully received from a third party authorized to make such disclosure, (iv) has been approved for release by the disclosing party in writing, or (v) is required to be disclosed by a competent legal tribunal.

## 7. LIMITATION ON DAMAGES.

(a) Limitation. In no event will Company be liable to Advertiser for any lost profits, lost data, costs of procurement of substitute goods or services, or any form of special, incidental, indirect, consequential or punitive damages of any kind (whether or not foreseeable), whether based on breach of contract, tort (including negligence), product liability or otherwise, even if Company is informed in advance of the possibility of such damages. Company's total liability under this Agreement is limited to the payments received by Company from Advertiser hereunder for the current term of this Agreement only, without regard to any previous agreements or versions of this Agreement between the Company and the Advertiser.

(b) Failure of Essential Purpose. The parties have agreed that the limitations and exclusions of liability specified in this Agreement will survive and apply even if any limited remedy specified in this Agreement is found to have failed of its essential purpose.

(c) Basis of the Bargain. Advertiser acknowledges that Company has set its rates and entered into this Agreement in reliance upon the limitations of liability and the disclaimers of warranties and damages set forth herein, and that the same form an essential basis of the bargain between the parties.

## 8. TERM AND TERMINATION.

(a) Term. The term of this Agreement commences on the Effective Date and, unless earlier terminated in accordance with this Section 8 or Section 3, will continue in effect for the full term of the agreement. This Agreement may not be renewed. If Advertiser is interested in continuing Advertising with the Company, a new Agreement will be signed. Prices in the Rate Card or Advertising Program will be subject to updates and changes and must be agreed to be both parties in the new Agreement.

(b) Termination. In the event of a breach by Advertiser of any of its obligations hereunder, Company may terminate this Agreement immediately upon written notice (see Section 9(d)) to Advertiser. In the event of a breach by Company of any of its obligations hereunder, Advertiser may terminate this Agreement upon thirty (30) days written notice to the other party.

(c) Effect of Termination. (i) Payment Obligations. If this Agreement is terminated by Company for breach by Advertiser, Advertiser shall remain liable for the value of the payments which are due or would otherwise become due and payable under the terms of this Agreement as fully performed. If this Agreement is terminated by Advertiser for

breach by Company, Advertiser shall remain liable solely for the value of the payments which are due for advertising services already provided hereunder. (ii) Survival. The following provisions will survive the expiration or termination of this Agreement for any reason: Section 1 (Definitions), Section 2 (No Warranty), Section 3(c), Section 4 (Indemnification), Section 6 (Confidentiality), Section 7 (Limitation on Damages), Section 8(c) (Effect of Termination), and Section 9 (General). (iii) Return of Materials. Upon expiration or termination of this Agreement for any reason, Advertiser will promptly and at the direction of Company either destroy, or return to Company, and will not take or use, all items of any nature that belong to Company or its Advertisers or other customers and all records (in any form, format, or medium) containing or relating to Confidential Information.

9. GENERAL.

(a) Assignment. Advertiser may not assign this Agreement in whole or in part, by operation of law or otherwise, without Company's written consent, and any attempted assignment of this Agreement without such consent will be null and void.

(b) Governing Law. The validity, construction and performance of this Agreement, and the legal relations between the parties to this Agreement, will be governed by and construed in accordance with the laws of the State of Delaware, excluding that body of law applicable to conflicts of law.

(c) Force Majeure. Except for the obligation to pay money, neither party will be liable to the other party for any failure or delay in performance caused by reasons beyond such party's reasonable control, and such failure or delay will not constitute a breach of this Agreement.

(d) Notices. Any notices under this Agreement will be sent by confirmed email, confirmed facsimile, nationally-recognized express delivery service, or certified or registered mail, return receipt requested, to the address specified on the cover sheet or such other address as the party specifies in writing. Notice by confirmed facsimile or express delivery service will be deemed received and effective upon delivery. Notice by certified or registered mail will be deemed received and effective five (5) days after dispatch.

(e) Waiver. The waiver of any breach or default of this Agreement will not constitute a waiver of any subsequent breach or default, and will not act to amend or negate the rights of the waiving party.

(f) Severability. If one or more of the provisions contained in this Agreement is determined to be invalid, illegal or unenforceable in any respect under any applicable statute or rule of law, then such provision will be considered inoperable to the extent of such invalidity, illegality or unenforceability, and the remainder of this Agreement will continue in full force and effect. The parties hereto agree to replace any such invalid,

illegal or unenforceable provision with a new provision that has the most nearly similar
permissible economic and legal effect.

IN WITNESS WHEREOF the parties hereto have set their hands and seals the day and
year first above written.

RIVERSIDE MANITOBA, INC.   )
            )
            )_____
            )LESLIE LOUNSBURY, PRESDIENT
            )
in the presence of       )
            )
            )
_____ )
Witness

MANGAPETS INC.      )
            )_____
            )PAUL BAINS, SECRETARY,DIRECTOR
            )
in the presence of       )
            )
            )
_____ )
Witness

illegal or unenforceable provision with a new provision that has the most nearly similar permissible economic and legal effect.


IN WITNESS WHEREOF the parties hereto have set their hands and seals the day and year first above written.

RIVERSIDE MANITOBA, INC.                    )
                                            )
                                            )
                                            )LESLIE LOUNSBURY, PRESIDENT
                                            )
in the presence of                          )
                                            )
                                            )
_____                   )
Witness


MANGAPETS INC.                              )
                                            )_____
                                            )PAUL BAINS, SECRETARY,DIRECTOR
                                            )
in the presence of                          )
                                            )
                                            )
_____                   )
Witness